

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00410-CV

———————————————

RAWNDA DRAPER, MARK SCOTT, MEGAN SCOTT, JEREMY FENCEROY, AND BRADLEY HERBERT, Appellants

V.

CITY OF ARLINGTON, TEXAS, AND W. JEFF WILLIAMS, MAYOR OF THE CITY OF ARLINGTON, Appellees

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-310481-19

Before Kerr, Bassel, and Womack, JJ.
Opinion by Justice Kerr

**OPINION**

This appeal arises from a challenge to two City of Arlington municipal ordinances regulating short-term rentals (STRs).[1] Rawnda Draper, Mark and Megan Scott, Jeremy Fenceroy, and Bradley Herbert (collectively, "the Homeowners") own residential properties in Arlington that they have leased to others on a short-term basis. In April 2019, the City of Arlington adopted two complementary ordinances: (1) an ordinance amending the City's Unified Development Code to specifically allow STRs as permitted uses only in certain areas of the City (the "Zoning Ordinance")[2] and (2) an ordinance regulating the operation of STRs (the "STR Ordinance"). As a result, the Homeowners sued the City and its mayor, seeking declarations that both ordinances violate their due-course-of-law and equal-protection rights under the Texas Constitution and that the STR Ordinance's prohibition against STR tenants' congregating outdoors on the premises during certain hours violates the tenants' assembly and freedom-of-movement rights under the Texas Constitution.

The Homeowners applied for a temporary injunction to enjoin the City and the mayor from enforcing the ordinances. The trial court denied the application, and the

[1]An STR is "[a] residential premise[s], or portion thereof, used for lodging accommodations for occupants for a period of less than thirty (30) consecutive days." Arlington, Tex., Ordinance 19-014 (Apr. 23, 2019).

[2]The parties dispute whether the City's pre-amendment Unified Development Code had or had not allowed STRs as a permitted use. This issue is irrelevant to our resolution of this appeal.

2

Homeowners have appealed, contending in four issues that the trial court abused its discretion by denying their temporary-injunction application.[3] We will affirm the trial court's order.

## I. Background

The City of Arlington sits between the cities of Dallas and Fort Worth and is home to the Dallas Cowboys, the Texas Rangers, Six Flags Over Texas, and The University of Texas at Arlington. With the City's location in the middle of the Dallas–Fort Worth Metroplex, its attractions, and the rise of websites like Airbnb, the City has experienced an uptick in the short-term rental of residential properties. But for some Arlington residents who live near STRs, this influx of transitory tenants into residential neighborhoods has created problems: noise disturbances, wild parties, and excessive street parking, as well as trash overflowing into the streets and tenants' engaging in fistfights and urinating in front yards. According to Arlington resident Kari Garcia, STRs are a "nightmare for the neighbors."

In response to the increasing use of homes as STRs and their attendant issues, the City engaged in an "extensive period of public comment, public input, and work sessions with the legislative body and planning commission" to strike a "reasonable balance" between the interests of residents and of STR owners and operators. Among

---

[3]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (providing for interlocutory appeal from a trial-court order granting or refusing a temporary injunction).

other things, the City hired consultants, mapped the distribution of STRs across the City according to census-tract data, and sought citizen input through a series of townhall meetings, surveys, an open house, and small group meetings with STR proponents and opponents. For over two years, the STR issue was discussed at almost 20 Arlington city-council meetings at which citizens on both sides of the issue voiced their opinions. The city council tasked the City's Department of Planning and Development Services with compiling public input, analyzing other cities' approaches to STRs, developing regulatory options, and presenting its findings to the council. Ultimately, in April 2019, the city council enacted the Zoning Ordinance and the STR Ordinance. *See* Arlington, Tex., Ordinances 19-014, 19-022 (Apr. 23, 2019).

The Zoning Ordinance created an STR Zone, which the ordinance defined as "[a] geographically contiguous area, extending approximately one mile from Arlington's entertainment hub, that is bounded on the north by E. Lamar Blvd., on the west by Center Street, on the south by E. Abram Street, and on the east by southbound State Highway 360 frontage road." Arlington, Tex., Ordinance 19-014. The Zoning Ordinance amended the City's Unified Development Code to allow residential structures and accessory secondary-living units to be used as STRs, provided they are within either the newly created STR Zone, a residential medium-density zoning district, a residential multifamily zoning district, or a nonresidential and mixed-use zoning district. *Id.* The Zoning Ordinance also outlaws operating an STR without a short-term-rental permit issued in accordance with the STR Ordinance. *Id.*

4

The STR Ordinance in turn prescribes the permitting process and imposes regulations on STR owners and tenants.[4] *See* Arlington, Tex., Ordinance 19-022. The permitting process requires, among other things, proof of insurance coverage of up to $1 million per occurrence, *see id.* § 3.07, and a physical inspection by the City to ensure "compliance with minimum health and safety requirements for use and occupancy," *id.* § 3.08. The STR Ordinance additionally

- prohibits "the congregation of occupants outside at the premises between the hours of 10:00 p.m. and 9:00 a.m.";

- proscribes the advertising of an on-premises special event such as a "banquet, wedding, reception, reunion, bachelor or bachelorette party, concert, or any similar activity that would assemble large numbers of invitees";

- limits the number of STR occupants;

- imposes parking restrictions and limits the number of vehicles allowed at an STR;

- prohibits the physical conversion of the premises to add additional bedrooms for STR use;

---

[4]Like the Zoning Ordinance, the STR Ordinance also bans the operation of unpermitted STRs. *See* Arlington, Tex., Ordinance 19-022, § 3.01.

5

- disallows the use of amplified sound equipment that "produces sound audible beyond the property line of the premises between the hours of 10:00 p.m. and 9:00 a.m."; and

- prohibits an owner or occupant from putting trash out for pickup before 7:00 p.m. the evening before scheduled pickup or on a day not scheduled for pickup by the City.

*Id.* §§ 3.12–.13, 3.15–.19. The STR Ordinance also requires STR owners and operators to notify STR occupants of these regulations. *Id.* § 3.20.

The five Homeowners own properties in the City. Draper and Fenceroy live in their homes and have rented bedrooms to short-term occupants. Neither of their homes is in the STR Zone or within a zoning district in which STRs are allowed. The Scotts own three properties. One of them is in the STR Zone, and another is in a zoning district in which STRs are allowed. The Scotts' third property—which they bought intending to turn it into an STR but which is their current residence—is not in the STR Zone or a zoning district in which STRs are allowed. Herbert owns two STR properties, one of which is in the STR Zone. The other is not, nor is it in a zoning district in which STRs are allowed.

The Homeowners sued the City and its mayor seeking declarations that (1) the STR Ordinance violates STR tenants' freedom-of-assembly rights under the Texas Constitution; (2) the Zoning Ordinance and the STR Ordinance violate the

6

Homeowners' substantive-due-course-of-law rights under the Texas Constitution; (3) the STR Ordinance violates STR tenants' freedom of movement rights under the Texas Constitution's substantive-due-course-of-law clause; (4) the Zoning Ordinance and the STR Ordinance violate the Homeowners' equal-protection rights under the Texas Constitution; and (5) the Zoning Ordinance and the STR Ordinance are ultra vires acts that exceed the City's and the mayor's zoning powers. The Homeowners also sought to enjoin the City from enforcing both ordinances.

At the evidentiary temporary-injunction hearing, Draper, Fenceroy, Herbert, and Mark Scott testified. Also testifying were Richard Gertson, who is the assistant director of the City's Department of Planning and Development Services, and Garcia, who lives across the street from an STR[5] with her husband and two children. The trial court denied the Homeowners' temporary-injunction request without making findings of fact and conclusions of law. The Homeowners have appealed, and raise four issues[6]:

- The Homeowners are likely to prevail on their claim that the Zoning Ordinance violates the Texas Constitution's substantive-due-course-of-law clause because the right to lease one's private property is a vested

---

[5]None of the Homeowners own this STR.

[6]In addition to the parties' briefs, we have received amicus briefs supporting the Homeowners from the Texas Association of Realtors and the State of Texas. *See* Tex. R. App. P. 11.

7

right and because the City's prohibition against STRs is unrelated to a legitimate governmental interest.

- The Homeowners are likely to prevail on their claim that the STR Ordinance is an unconstitutional restriction on STR tenants' freedoms of assembly and movement because it unilaterally prohibits, at certain times, assembly on private property.

- The Homeowners are likely to prevail on their claim that the Zoning Ordinance and the STR Ordinance violate the Texas Constitution's equal-protection clause because both ordinances treat short-term renters and landlords differently from long-term renters and landlords without compelling evidence justifying this disparate treatment.

- The Homeowners will suffer imminent and irreparable harm from the constitutional-rights deprivations that the ordinances bring about.

## II. Standard of Review and Law Applicable to Temporary Injunctions

A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g). Its purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Clint ISD v. Marquez*, 487 S.W.3d 538, 555 (Tex. 2016). The status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (orig.

8

proceeding) (quoting *Janus Films, Inc. v. City of Fort Worth*, 358 S.W.2d 589, 589 (Tex. 1962)).

Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Butnaru*, 84 S.W.3d at 204. A trial court abuses its discretion if it rules in an arbitrary manner or without reference to guiding rules and principles. *Id.* at 211. "Although a trial court does not abuse its discretion by basing its temporary injunction ruling on conflicting evidence or when some evidence of a substantive and probative character exists to support its decision, a trial court does abuse its discretion by misapplying the law to established facts." *T.L. v. Cook Children's Med. Ctr.*, 607 S.W.3d 9, 34 (Tex. App.—Fort Worth 2020, pet. denied), *cert. denied*, 141 S. Ct. 1069 (2021). "We review de novo any question-of-law rulings necessary to resolve whether a temporary injunction should issue." *Id.*

To obtain a temporary injunction, an applicant must plead and prove (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204; *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 220 (Tex. App.—Fort Worth 2009, pet. denied). The applicant has the burden of production to offer some evidence on each of these elements, *see In re Tex. Nat. Res. Conservation Comm'n*, 85 S.W.3d 201, 204 (Tex. 2002) (orig. proceeding), but he is not required to prove that he will ultimately prevail at trial on the merits, only that he is entitled to preservation of the status quo until then, *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). We thus

do not review the underlying case's merits, and we "will not assume that the evidence taken at a preliminary hearing will be the same as evidence developed at a full trial on the merits." *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978).

A probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it. *Frequent Flyer Depot*, 281 S.W.3d at 220. To prove probable injury, an applicant must show that he has no adequate remedy at law. *Savering v. City of Mansfield*, 505 S.W.3d 33, 49 (Tex. App.—Fort Worth 2016, pet. denied) (op. on reh'g). An injury is irreparable if damages would not adequately compensate the injured party or if they cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204; *Frequent Flyer Depot*, 281 S.W.3d at 220.

When, as here, the trial court does not make findings of fact or conclusions of law in support of its temporary-injunction ruling, we must uphold the trial court's order on any legal theory that the record supports. *Davis*, 571 S.W.2d at 862; *Henry F. Coffeen III Mgmt., Inc. v. Musgrave*, No. 02-16-00070-CV, 2016 WL 6277375, at *2 (Tex. App.—Fort Worth Oct. 27, 2016, no pet.) (mem. op.).

## III. Discussion

**A. The Homeowners' Due-Course-of-Law Claim**

In the Homeowners' first issue, they argue that they are likely to prevail on their request for a declaration that as applied to them, the Zoning Ordinance violates their substantive-due-course-of-law rights under Article 1, Section 19 of the Texas Constitution because (1) the Homeowners have a vested right to lease their property

and (2) the Zoning Ordinance is not rationally related to a legitimate governmental interest.[7] *See* Tex. Const. art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land."). The Homeowners pleaded that the City's claimed "legitimate interest in establishing noise and occupancy regulations . . . simply does not justify the wholesale elimination of [the Homeowners'] right to rent their homes for less than thirty days (in the case of rentals outside the STR Zone)" and that the Zoning Ordinance's "blanket prohibition on rentals outside of the STR [Z]one is not rationally related to the protection of public health, safety[,] or welfare, and is unduly burdensome when considered in light of the alleged government interests it is designed to address." *See Patel v. Tex. Dep't of Licensing & Regulation*, 469 S.W.3d 69, 87 (Tex. 2015). On appeal, the Homeowners do not argue that the Zoning Ordinance is unduly burdensome, but they maintain that its STR limitations are not rationally related to a legitimate governmental interest. Because whether the Zoning Ordinance rationally relates to a legitimate governmental interest is dispositive of the Homeowners' first issue, we address that question first.[8]

---

[7]Although the Homeowners also pleaded that the STR Ordinance violates their substantive-due-course-of-law rights, they do not argue on appeal that they are likely to prevail on this claim.

[8]Although at this stage of the proceedings we need not reach the issue of whether the Homeowners have a vested right to lease their properties, we note that within their vested-rights discussion, the Homeowners spend several pages discussing *Village of Tiki Island v. Ronquille*, 463 S.W.3d 562 (Tex. App.—Houston [1st Dist.]

11

Ordinances are presumed to be constitutional. *See id.*; *City of Brookside Vill. v. Comeau*, 633 S.W.2d 790, 792 (Tex. 1982). To overcome this presumption, the Homeowners—in advancing an as-applied challenge under the Texas Constitution's substantive-due-course-of-law requirement—must prove either that "the statute's purpose could not arguably be rationally related to a legitimate governmental interest" or that "when considered as a whole, the statute's actual, real-world effect as applied to the challenging party could not arguably be rationally related to . . . the governmental interest."[9] *Patel*, 469 S.W.3d at 87.

"Texas due course of law protections in Article I, § 19, for the most part, align with the protections found in the Fourteenth Amendment to the United States Constitution." *Id.* at 86. According to the Texas Supreme Court, an ordinance violates due process if it "has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public

---

2015, no pet.), in the context of explaining the Zoning Ordinance's economic impact and effect on the Homeowners' investment-backed expectations. The State of Texas's amicus brief similarly discusses *Tiki Island* and the Zoning Ordinance's economic effects, expressly arguing that the Zoning Ordinance is a regulatory taking. But the Homeowners have not pleaded a regulatory-takings claim.

[9]Again, the Homeowners do not argue on appeal that the Zoning Ordinance is unduly burdensome. *See Patel*, 469 S.W.3d at 87 (stating that a "proponent of an as-applied challenge" under the Texas Constitution's substantive-due-course-of-law requirement can overcome a statute's presumptive constitutionality by proving that "when considered as a whole, the statute's actual, real-world effect as applied to the challenging party . . . is so burdensome as to be oppressive in light of" a legitimate governmental interest).

12

morals, the public safety[,] or the public welfare in its proper sense." *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 938 (Tex. 1998) (quoting *Nectow v. City of Cambridge*, 277 U.S. 183, 187–88, 48 S. Ct. 447, 448 (1928)). To pass constitutional muster, an ordinance must be "designed to accomplish an objective within the government's police power" and be rationally related to the ordinance's purpose. *Id.* If it is at least "fairly debatable" that the ordinance was rationally related to a legitimate government objective, the ordinance must be upheld. *Id.* We are not concerned with whether the ordinance was effective; we ask only if the City could rationally have believed at the time of enactment that the ordinance would promote its objective. *See id.* We will not set aside an ordinance unless it is clearly arbitrary and unreasonable.[10] *See id.*; *see also City of San Antonio v. TPLP Office Park Props.*, 218 S.W.3d 60, 64–65 (Tex. 2007) ("The exercise of police power by a city must accord with substantive due process principles, that is, it cannot be arbitrary and unreasonable.").

Whether an ordinance violates due course of law is a legal question, but "the determination will in most instances require the reviewing court to consider the entire record, including evidence offered by the parties." *Patel*, 469 S.W.3d at 87; *see TPLP Office Park Props.*, 218 S.W.3d at 65 ("The trial court resolves disputed fact issues, but the ultimate question of whether an action or ordinance regulating property violates due process is a question of law." (citing *Mayhew*, 964 S.W.2d at 932)).

---

[10]Here, of course, we are not called on to make any ultimate merits-based decisions.

13

The City argues that the Zoning Ordinance is related to the following governmental interests: (1) safeguarding the life, health, safety, welfare, and property of STR occupants, neighborhoods, and the general public and (2) minimizing the adverse impacts resulting from increased transient rental uses in neighborhoods that were planned, approved, and constructed for single-family residences. These purposes are legitimate governmental interests. *See TPLP Office Park Props.*, 218 S.W.3d at 65 (citing *Mayhew*, 964 S.W.2d at 934, 938); *see also Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S. Ct. 1536, 1541 (1974) (noting that a city's police power "is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people"). The Homeowners assert that the City introduced no evidence demonstrating that STRs cause "residential disharmony to a different extent than other properties" and that unspecified "state laws and local ordinances already prohibit all of the conduct the City cites to justify its ban." Even if the latter is true,[11] the City did present evidence that STRs can disrupt residential neighborhoods and that restricting STRs to the STR Zone and certain zoning districts is rationally related to the City's objectives.[12]

---

[11]The Homeowners have not pointed us to any such state laws or City ordinances.

[12]The Homeowners cite *Zaatari v. City of Austin*, 615 S.W.3d 172 (Tex. App.—Austin 2019, pet. denied)—a case involving a challenge to the City of Austin's STR ordinances—in support of their argument that the Zoning Ordinance is not rationally related to a legitimate governmental interest. The Homeowners rely on the *Zaatari* opinion's analysis of the Austin STR owners' claim that Austin's ordinance banning

14

Garcia, who lived in an otherwise quiet single-family residential neighborhood, testified that the house across the street from hers had been used by its out-of-state owner as an STR for the last two years. That STR housed as many as 15 guests and was occupied 75 to 80 percent of the time. The STR had created noise disturbances, a constant influx of new people in and out of the neighborhood, parking congestion, and trash in the streets.[13] The increased noise caused Garcia to call the police at least a dozen times but to no effect because such calls are considered nonemergency ones, meaning that the police do not show up right away. Garcia testified that the STR is "great for the owner who's making all this money, but it's not great for the neighbors.

---

certain STRs was unconstitutionally retroactive. *See id.* at 188–92; *see also* Tex. Const., art. I, § 16 (prohibiting retroactive laws). To determine whether a law is unconstitutionally retroactive, a court considers three factors: "(1) 'the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings;' (2) 'the nature of the prior right impaired by the statute;' and (3) 'the extent of the impairment.'" *Id.* at 188 (quoting *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 145 (Tex. 2010)). This test "acknowledges the heavy presumption against retroactive laws by requiring a compelling public interest to overcome the presumption." *Id.* But the Homeowners have not pleaded a retroactivity claim, and the retroactivity analysis fundamentally differs from the rational-basis analysis applied in due-course-of-law challenges. We thus conclude that *Zaatari* is inapposite here.

We note, too, that despite the lack of a retroactivity claim, the State of Texas's amicus brief devotes several pages to arguing that the Zoning Ordinance is unconstitutionally retroactive.

[13]Garcia attributed the trash problem to STR tenants' not knowing what day the City collected trash and putting the trash "out on a Sunday and then leav[ing] for the weekend, and [because] trash pickup is not until Wednesday[,] . . . the trash blows up and down the street from Sunday to Wednesday when [the City] pick[s] it up."

It's a nightmare for the neighbors."[14] Garcia further testified that she attended three or four city-council meetings to tell "her story" and that "[t]here were numerous people who spoke and who had, unfortunately, very similar stories to [hers]."

Gertson, the assistant director of the City's Department of Planning and Development Services, testified that the City's goal in developing the ordinances was to find a "reasonable balance" between STR operators and homeowners. Gertson worked with others in his department and with the City's planning commission to draft the Zoning Ordinance "after an extensive period of public comment, public input, and work sessions with the legislative body and planning commission."

According to Gertson, census-tract maps revealed a higher percentage of STRs compared to single-family residences around the City's entertainment district, which contains such attractions as AT&T Stadium, Globe Life Park, Six Flags Over Texas, and Hurricane Harbor. In a staff report that Gertson prepared for the city council, he explained that "[t]he City's entertainment and sports venues induce much of the STR traffic." He further explained that within the STR Zone, "STRs and those premier attractions complement each other and provide mutual economic support" and that "[u]nlike other residential areas of the City, the presence of tourists or short-term guests on a frequent basis and the associated increase in activity are compatible with,

---

[14]The Homeowners' testimony at the temporary-injunction hearing showed that their STRs did not disrupt the surrounding neighborhoods, in stark contrast to the STR in Garcia's neighborhood. It appears that the Homeowners had all operated their STRs with virtually no complaints from their neighbors.

and do not disrupt, the intense activity taking place in proximity of the entertainment and sports venues."

Gertson testified that the City also chose to allow STRs in higher-density residential areas—such as zoning districts in which townhomes, condominiums, duplexes, and apartment complexes are permitted—and in commercial districts, but not in lower-density residential districts, because the City believed that STRs were more appropriate in higher-density residential areas than in lower-density ones. Gertson explained that the Zoning Ordinance was designed to advance the health, safety, and welfare of the City's residents because it was designed to maintain the stability, quiet, and repose of lower-density residential districts, which were environments that the City had determined that it wanted to protect and preserve for single-family homeowners.

Gertson admitted that no "data set" exists to substantiate the City's claim that excluding STRs allows neighborhoods "to maintain their quiet and repose." But Gertson testified that the Zoning Ordinance was developed from public comment and input, and the city council's findings in the Zoning Ordinance support his testimony and the City's objectives in enacting it:

- "[T]he City Council directed the Planning and Development Services Department to research the nature and extent of short-term rentals (STRs) in the City of Arlington, obtain public input, and develop fair and balanced regulatory options, which provide opportunities for conducting

17

STRs and protecting residential neighborhoods where STRs may be a disruptive land use."

- "[I]n open work session the City staff presented STR data and the results of preference surveys reflecting a desire of citizens and homeowners to maintain the integrity of single-family areas while allowing STRs within certain areas of the city."

- "[D]ata show that within the census tract surrounded by the city's entertainment district as much as 13.5 percent of the single-family homes are currently used as STRs, which is by far the highest ratio of STRs to single-family homes within the city, and that two adjacent census tracts have the second and third highest ratios, both of which include portions of the entertainment district."

- "[B]ased upon such data, the City Council finds that the City of Arlington's entertainment and sports venues are the principal draw for much of the city's STR market and that both the venues and the STRs operating near to the venues derive a mutual economic benefit from locating within proximity to each other."

- "[T]he City Council finds that it is reasonable and proper to foster this mutual beneficial relationship by permitting short-term rentals to co-locate in single-family neighborhoods within walking distance of the

18

major sports and entertainment venues, and that walkable co-location may serve a secondary purpose of incrementally reducing vehicular congestion during sporting events."

- "[D]ata also show that medium and higher density residential locations across the city include thousands of parcels with single-family dwelling units, and accordingly, the City Council finds that such locations are less disrupted by the presence of STRs due to current density, and therefore, provide adequate opportunities for STRs to operate outside the city's low-density residential neighborhoods."

- "[A]fter notice and public hearing, and upon consideration of the recommendation of the Commission and of all testimony and information submitted during the public hearing, the City Council has determined that it is in the best interest of the public and in support of the health, safety, morals and general welfare of the citizens that [the Zoning Ordinance] be approved."

Arlington, Tex., Ordinance 19-014.

Along with Gertson's and Garcia's testimony, these findings indicate that the City's decision to allow STRs in the STR Zone and in high- and medium-density residential areas but not in low-density residential areas is rationally related to objectives within the City's police powers. Accordingly, based on the evidence

19

presented at the temporary-injunction hearing, we conclude that the Homeowners failed to present evidence tending to prove that the Zoning Ordinance violates their substantive-due-course-of-law rights and thus failed to show that they were likely to prevail on their request for a declaration that the Zoning Ordinance violates their substantive-due-course-of-law rights under Article 1, Section 19 of the Texas Constitution. We overrule the Homeowners' first issue.

## B. The Homeowners' Assembly-Clause and Freedom-of-Movement Claims

In the Homeowners' second issue, they contend that they are likely to prevail on their claims that the STR Ordinance unconstitutionally restricts their tenants' freedoms of assembly and movement because the ordinance unilaterally prohibits assembly on private property at certain times. The Homeowners specifically challenge Section 3.17 of the STR Ordinance, which provides: "It shall be unlawful for an owner or person to allow the congregation of occupants outside at the premises between the hours of 10:00 p.m. and 9 a.m." Arlington, Tex., Ordinance 19-022, § 3.17. The Homeowners pleaded that this section of the STR Ordinance infringes on their tenants' "freedom of assembly rights protected by . . . Article I, Section 27 of the Texas Constitution" and "coerces Plaintiff Homeowners to inflict such violations against their tenants."[15] *See* Tex. Const. art. I, § 27 ("The citizens shall have the right,

---

[15]The Homeowners also pleaded a freedom-of-assembly challenge on their tenants' behalf to the STR Ordinance's prohibition against owners' and occupants' allowing, advertising, or promoting special events to be held on the premises. *See*

in a peaceable manner, to assemble together for their common good; and apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance."). The Homeowners additionally pleaded that Section 3.17 "also infringes STR tenants' freedom of movement under the Texas Constitution's substantive due course of law clause and coerces [the Homeowners] to enforce such an infringement against their own tenants." *See id.* art. I, § 19.

The City questions the Homeowners' standing to bring their assembly-clause claim, presumably because the Homeowners' assembly-clause challenge is based on an alleged violation of their tenants'—not the Homeowners'—assembly rights.[16] Standing is a necessary component of subject-matter jurisdiction and thus cannot be presumed or waived. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44, 445–46 (Tex. 1993). Standing requires a real controversy between the parties that will be actually determined by the judicial declaration sought. *Id.* at 446. "[T]o challenge a statute, a plaintiff must . . . suffer some actual or threatened restriction under that statute" and "must contend that the statute unconstitutionally restricts the *plaintiff's*

---

Arlington, Tex., Ordinance 19-022, § 3.19. They do not raise this challenge in this appeal.

[16]The Homeowners specifically pleaded that they were suing "on behalf of tenants of their short-term rentals *based on the STR Ordinance's infringement upon their tenants' rights protected under the Texas Constitution* which are being infringed by the STR Ordinance's requirement that Plaintiffs restrain their tenants' freedoms of movement and assembly." [Emphasis added.]

21

rights, not somebody else's." *Tex. Workers' Comp. Comm'n v. Garcia*, 893 S.W.2d 504, 518 (Tex. 1995); *see Patel*, 469 S.W.3d at 77.

"Standing is a constitutional prerequisite to maintaining suit." *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 646 (Tex. 2004). "The standing requirement stems from two limitations on subject[-]matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision." *Tex. Ass'n of Bus.*, 852 S.W.2d at 443. The open-courts provision provides that "[a]ll courts shall be open, and [that] every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." Tex. Const. art. I, § 13. The Texas Supreme Court has held that this provision "contemplates access to courts *only for those litigants suffering an injury*." *Tex. Ass'n of Bus.*, 852 S.W.2d at 444 (emphasis added).

Here, the Homeowners pleaded in the trial court and argue on appeal that Section 3.17 of the STR Ordinance violates the assembly and movement rights of their STR tenants. They do not contend that the ordinance violates their own assembly and movement rights. *See Garcia*, 893 S.W.2d at 518 (stating that standing to challenge a statute requires that a plaintiff contend that the statute unconstitutionally restricts his rights, not someone else's). The Homeowners suggest that they have standing to raise a constitutional challenge on their tenants' behalf because "[r]egulations infringing [on] the constitutional rights of a group may be challenged by a third party if such party is tasked with enforcing the unconstitutional law through

his or her own compliance."[17] To support this contention, the Homeowners cite *Eisenstadt v. Baird*, in which the Supreme Court allowed a distributor of contraceptives to assert unmarried distributees' rights because of the litigation's impact on third-party interests.[18] 405 U.S. 438, 445–46, 92 S. Ct. 1029, 1034–35 (1972) (citing *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678 (1965)). But the Homeowners do not cite nor have we found any Texas state-court cases permitting a party to challenge a statute's constitutionality based on its alleged violation of a third party's constitutional rights.

The Homeowners pleaded—and maintain on appeal—that Section 3.17 of the STR Ordinance unconstitutionally restricts only their tenants' assembly and movement rights under the Texas Constitution, and we thus conclude that they lack

---

[17]We note that both parties raise standing only in passing and that neither the Homeowners nor the City briefed the issue, despite its importance. But this is of no moment because, as noted, standing is a component of subject-matter jurisdiction, and thus can be "raised for the first time on appeal by the parties or the court." *Tex. Ass'n of Bus.*, 852 S.W.2d at 446.

[18]As one federal district court has explained,

> There are two types of cases involving *jus tertii* standing: (1) where the litigants challenge statutes that regulate their activity and thereby violate the rights of third parties; and (2) where litigants seek to assert only the rights of third parties being violated by a statute. In the first, exemplified by *Griswold* and *Eisenstadt*, standing depends upon whether the litigant's relationship with [the] third party is such that "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue." In the second, standing depends on whether the third party is able to assert the right before the court on his own behalf.

*Dickerson v. Bailey*, 87 F. Supp. 2d 691, 702 (S.D. Tex. 2000) (footnote omitted) (citations omitted).

standing to bring these claims on their tenants' behalf because the Homeowners are not contending that the statute unconstitutionally restricts their rights, but someone else's.[19] *See Garcia*, 893 S.W.2d at 518. Accordingly, we conclude that the Homeowners have failed to show on this record and as their claims are currently pleaded that they will likely prevail on their assembly-clause and freedom-of-movement claims because they lack standing. We thus overrule the Homeowners' second issue.

## C. The Homeowners' Equal-Protection Claim

The Homeowners argue in their third issue that they are likely to prevail on their claim that as applied to them, the Zoning Ordinance and the STR Ordinance violate their equal-protection rights under the Texas Constitution by treating STR renters and landlords differently from those in long-term rental situations without compelling evidence justifying this "disparate treatment." *See* Tex. Const. art. I, § 3 ("All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services."). The Homeowners assert that both ordinances treat short-term and long-term rental activity differently "by restraining and even

---

[19]In their briefing on this issue, the Homeowners rely on the *Zaatari* opinion's analysis of the Austin STR owners' assembly-clause challenge to the Austin STR ordinance. *See* 615 S.W.3d at 192–202 (analyzing the Texas Constitution's assembly clause and concluding that a section of the Austin STR ordinance infringed on STR owners' and their tenants' assembly rights). The City of Austin contested the STR owners' right to raise constitutional claims on their tenants' behalf, but because at least one of the property owners was also an STR tenant, the *Zaatari* court concluded that she had standing to pursue those claims. *See id.* at 183.

prohibiting, in some areas, STR activity" and that there is no evidence demonstrating "a rational relation between the restrictions imposed and the interests sought."

A colorable as-applied equal-protection claim requires that the government treat the claimant differently from other similarly situated landowners without any reasonable basis. *Mayhew*, 964 S.W.2d at 939. Unless the challenged ordinance discriminates against a suspect class, the ordinance generally must only be rationally related to a legitimate state interest to survive an equal-protection challenge.[20] *Id*. "Economic regulations, including zoning decisions, have traditionally been afforded only rational relation scrutiny under the equal protection clause." *Id*.

Here, the Homeowners assert that the ordinances "plainly treat" them differently from property owners leasing their properties to tenants for more than 30 days. But the Homeowners offer no argument or authority or point to any facts demonstrating that they are similarly situated to property owners who lease their properties long-term. Even if they had, the Homeowners' equal-protection claim still requires them to show that the Zoning Ordinance and the STR Ordinance are not rationally related to legitimate state interests. *See id*. As noted, the City's stated legitimate governmental interests are (1) safeguarding the life, health, safety, welfare, and property of STR occupants, neighborhoods, and the general public and (2) minimizing the adverse impacts resulting from the increase in transient rental uses

---

[20]The Homeowners did not assert that either ordinance discriminates against a suspect class.

in neighborhoods planned, approved, and constructed for single-family residences.[21]

The Homeowners argue that there is no evidence demonstrating a rational basis between these interests and the two ordinances, specifically that (1) there was no basis for the 30-day cutoff between STRs and long-term rentals, (2) there was no evidence justifying the prohibition of STRs in low-density residential areas outside the STR Zone, and (3) there was no evidence that STR tenants "are more prone to disruptive behavior [than long-term tenants] and should be subject to the restrictions imposed upon them by [the STR Ordinance]."

Regarding the 30-day cutoff between STRs and long-term rentals, Gertson testified that "in planning, in land use regulation, [the cutoff is] based upon a common distinction made between transient occupancy versus longer-term occupancy."

---

[21]As one out-of-state court has observed,

> It stands to reason that the "residential character" of a neighborhood is threatened when a significant number of homes . . . are occupied not by permanent residents but by a stream of tenants staying a weekend, a week, or even 29 days. Whether or not transient rentals have the other "unmitigatable [sic], adverse impacts" cited by the Council, such rentals undoubtedly affect the essential character of a neighborhood and the stability of a community. Short-term tenants have little interest in public agencies or in the welfare of the citizenry. They do not participate in local government, coach little league, or join the hospital guild. They do not lead a Scout troop, volunteer at the library, or keep an eye on an elderly neighbor. Literally, they are here today and gone tomorrow—without engaging in the sort of activities that weld and strengthen a community.

*Ewing v. City of Carmel-By-The-Sea*, 286 Cal. Rptr. 382, 388 (Cal. Ct. App. 1991).

Additionally, as more than one Homeowner testified, a rental for fewer than 30 days triggers the imposition of hotel-occupancy taxes. *See* Tex. Tax Code Ann. §§ 156.001(b), .051. Further, as the Zoning Ordinance's recitals and Garcia's testimony exemplify, the use of single-family residences as STRs can negatively affect the residential character of neighborhoods. We thus conclude that the 30-day distinction between STRs and long-term rentals is rationally related to the City's legitimate governmental interests.

Similarly, the Zoning Ordinance's prohibition against STRs outside the STR Zone and medium-to-high-density residential areas is rationally related to legitimate governmental interests.[22] As set out in our due-course-of-law analysis, the Zoning Ordinance's establishment of the STR Zone near the City's entertainment district balanced the economic benefit of allowing STRs within the City with citizens' and homeowners' desires to maintain the integrity of single-family neighborhoods. Census-tract maps reflected a higher percentage of STRs compared to single-family residences around the City's entertainment district. As Gertson explained in his staff report, "[t]he City's entertainment and sports venues induce much of the STR traffic." He further explained that within the STR Zone, "STRs and those premier attractions complement each other and provide mutual economic support" and that "[u]nlike other residential areas of the City, the presence of tourists or short-term guests on a

---

[22]The Homeowners' argument implies that STRs are allowed only in the STR Zone. But, as noted, STRs are allowed in certain zoning districts in the City.

frequent basis and the associated increase in activity are compatible with, and do not disrupt, the intense activity taking place in proximity of the entertainment and sports venues."

Finally, the STR Ordinance's restrictions on STRs are rationally related to legitimate governmental interests. The Homeowners specifically assert that there is no rational relationship because there is no evidence that STRs are "more prone to vehicle over-parking than other residences"; "[t]here is no better justification given for preventing property owners from converting additional space in their homes into spare bedrooms for STR use than there is for denying the same right to those owners wishing to lease to long-term tenants"; and "there is no cognizable reason" to limit the number of tenants who can stay in an STR but not limit the number in a long-term rental. The City, however, presented evidence establishing a rational relationship between the STR Ordinance's restrictions and its legitimate governmental interests of minimizing STRs' adverse impacts on neighborhoods planned, approved, and constructed for single-family residences and of safeguarding the life, health, safety, welfare, and property of STR occupants, neighborhoods, and the general public.

Regarding her neighborhood's STR, Garcia testified that on most weekends, between six and twelve cars were parked on the street, and on one weekend, there were more than twenty-five cars parked on the street. And while Gertson admitted there was no "data set" to quantify all the following city-council findings supporting

the STR Ordinance, he testified they were made after considering testimony and input from citizens and other information gathered by City staff:

- "[T]he increase in the number of persons or entities desiring to rent their residential properties has led to the proliferation of transient and vacation rental uses within neighborhoods previously planned, approved and constructed for use as single-family residences."

- "[T]he use of single-family residences by individuals for short periods of time may negatively impact the residential character of many neighborhoods by reducing communication and accountability between permanent residents by partially substituting permanent residents with transient visitors."

- "[T]he regulation of the use and operation of such 'short-term rental' property is intended to prevent the further erosion of pre-existing and stable single-family neighborhoods, and further advance the City Council's objective of championing great neighborhoods."

- "[T]he rise of substitute land uses for residential property contributes to the shortage of affordable housing, both ownership and long-term rental."

- "[T]he Unified Development Code did not allow the use of property zoned residential to be used for transient, short-term stays for less than 30 days."

- "[T]he enforcement of land use regulations in residential property poses unique enforcement difficulties and merits a stand-alone ordinance to provide clear rules for such rentals."

- "[T]he City Council reviewed and studied a variety of possible regulations for short-term rentals, and determined that said temporary use should be restricted to nonresidential, mixed-use[,] and multi-family zoning use districts, and to single-family zoning use districts adjoining the major sports complex area of the City of Arlington."

- "[T]he requirement of an annual short-term rental permit that could be suspended or revoked in the event of repeated nuisance violations related to noise, trash, parking, etc. [is appropriate]."

- "[R]egulating the short-term rental of residential property is necessary for the health, safety and welfare of the general public, the promotion of consistent land uses and development, and the protection of landowners and residents of the City of Arlington."

Arlington, Tex., Ordinance 19-022.

Along with Gertson's and Garcia's testimony, these findings indicate that the City's decisions to restrict STRs to the STR Zone and certain zoning districts and to regulate the operation of STRs are rationally related to objectives within the City's police powers. Accordingly, based on the evidence presented at the temporary-

injunction hearing, the Homeowners failed to offer evidence tending to prove that either the Zoning Ordinance or the STR Ordinance violates their equal-protection rights and thus failed to show that they were likely to prevail on their request for declarations that both ordinances violate those rights under Article 1, Section 3 of the Texas Constitution. We overrule the Homeowners' third issue.

## IV. Conclusion

Having overruled the Homeowners first three issues, which are dispositive of their challenge to the trial court's order denying their temporary-injunction request,[23] we affirm the trial court's order.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: July 15, 2021

---

[23] *See* Tex. R. App. 47.1.